UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KATHERINE OSTER,

        Plaintiff,

   v.

CAITHNESS CORPORATION, et al.,

        Defendants.

Case No. 16-cv-03164-WHO

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff  Katherine Oster alleges that she is entitled to, but was denied, the opportunity to invest in an energy project that she helped develop and finalize while working at her former employer, Caithness Corporation ("Caithness").  She brings a number of claims, including (1) breach of an oral contract; (2) breach of an implied contract; (3) breach of the implied covenant of good faith and fair dealing; (4) false promise; (5) misrepresentation; (6) promissory estoppel; and (7) retaliation.  The defendants move for summary judgment because, among other reasons: Oster's contract and contract-dependent claims fail because she has not demonstrated the existence of a valid contract; her fraud and misrepresentation claims fail because she has not demonstrated that she relied on any misrepresentations; her promissory estoppel claim fails because she has not demonstrated that she relied on any promise; and, her retaliation claim fails because she had not demonstrated that she engaged in any "protected activity."  I agree that Oster has failed to demonstrate a material issue of fact with regard to these necessary elements of her claims.  Defendants' motion for summary judgment is GRANTED.[1]

---

[1] The parties' pending dispute regarding Caithness's request to alter the protective order in this case will be addressed in a separate order.

# BACKGROUND

### A.      The Job Offer

Caithness Corporation, based in New York, develops and operates renewable and traditional energy generation projects and energy storage projects.  In 2012, Caithness's President, Leslie Gelber, was looking to hire someone based on the west coast with experience in renewable energy sources and storage.  Def. Ex. 6, Gelber Depo at 19:10-11, 26:5-12 (Dkt. No. 54-8).  Oster had spent her career involved in the development of power projects and sustainable energy generation.  Pl. Ex. 7 (Dkt. No. 57-9).  She worked as a director or manager at various energy companies, spearheading the development and acquisition of power plants and solar, biomass, and biofuel technologies.  *Id.*

On October 15, 2012, Caithness approached Oster regarding a position as "Vice President – Development" at Caithness.  Oster Decl. ¶ 2 (Dkt. No. 58-4).  At the time, Oster was employed by First Solar, Inc. as a Director and its Vice President of Latin America Business Development. Pl. Ex. 9, Oster Depo at 53:14-21, 55:4-7 (Dkt. No. 57-11).  Before accepting Caithness's offer, Oster indicated that she was interested in becoming a partner at Caithness.  *Id.* at 27:4-11; Pl. Ex. 3, Gelber Depo at 34:2-35:5, 41:3-13 (Dkt. No. 58-8).  Gelber told her that it was not possible for her to become a partner immediately and that he would have to get to know her better before that was an option.  Pl. Ex. 3, Gelber Depo at 34:2-11.  However, he did indicate that there would be potential for her to become an investor on the projects she worked on.  Def. Ex. 1, Oster Depo at 28:12-29:7; Pl. Ex. 1, Bishop Depo at 36:13-37:17 (Dkt. No. 58-31).

On October 25, 2012 Oster accepted the employment offer and signed an Employment Agreement.  Def. Ex. 17 (Dkt. No. 54-19).  The Employment Agreement outlined that Oster would receive an annual salary and an annual target performance bonus, as well as other job benefits.  *Id.*  It stated that she was an at-will employee and that "[a]lthough your job duties, title, compensation and benefits . . . may change from time to time, the 'at will' nature of your employment may only be changed in a document signed by you and the President."  *Id.*  The Employment Agreement contained an integration clause that read: "This letter sets forth the terms of employment with Caithness and supersedes any prior representations or agreements, whether

2

United States District Court
Northern District of California

written or oral." *Id.* It did not mention or state that she would have the opportunity or right to invest in any energy projects that she helped develop for Caithness. *Id.*

### B. WestGen

In December of 2013, Oster helped lead a bid for a project known as WestGen with the company Southern California Edison. Oster Decl. ¶ 3; Pl. Ex. 11 (Dkt. No. 58-25). "WestGen" is a Caithness entity that was bidding on energy storage and gas-fired generation projects. Pl. Ex. 3, Gelber Depo at 48:8-24. Oster was listed as a "key member of the WestGen Development Team" in documents sent to Edison. Oster Decl. ¶ 3. In December, 2013, Caithness offered Oster the opportunity to invest in a 1% equity share of WestGen. *Id.* ¶ 4. It appears that, at that time, she was not told any of the details of the investment deal beyond that she would get a 1% interest in WestGen. Nor was she given any paperwork regarding the WestGen equity interest. *Id.* Instead, she was told that "the paperwork was not going to be done right away" but that "[i]t would be done if [Caithness] won the bid" on the project. Pl. Ex. 9, Oster Depo at 76:14-15.

Oster never signed any paperwork regarding the WestGen project and Caithness did not win the bid. Notwithstanding that fact, an April 17, 2014 application filed by Caithness and WestGen for a Minority and Women-owned Business Enterprise certification, signed under penalty of perjury, reports that Oster held a 1% interest in WestGen. Pl. Ex. 11.

### C. Moxie Freedom Project

In late 2014, one of Oster's former colleagues offered her, and her employer Caithness, the opportunity to join a natural gas power plant project that was in development called the "Moxie Freedom Project." Pl. Ex. 3, Gelber Depo at 86:14-16; Def. Ex. 12, Answer ¶ 28 (Dkt. No. 54-14). During the months of negotiations, Gelber mentioned to Oster that she would have an opportunity to invest in the Moxie Freedom Project. Pl. Ex. 9, Oster Depo at 109:5-110:10. For example, in early 2015 Oster, Gelber, and Scott Taylor, the CFO of Moxie, attended a meeting to finalize the term sheet for the Moxie project. *Id.* Gelber told Taylor and Oster that Oster would have an equity interest in the project. *Id.* at 114:8-18.

On May 13, 2015 Caithness sent Oster a more robust draft employment agreement than the one she had originally signed. Def. Ex. 18 (Dkt. No. 54-20); Def. Ex. 19 (Dkt. No. 55-8); This

new employment agreement included the requirement that Oster "identify for the sole benefit of Caithness Energy . . . any business opportunities whatsoever." *Id.* It also included a non-compete provision, a provision requiring arbitration in New York, and stated that "each party and its counsel have reviewed and revised this Agreement" so "the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed[.]" *Id.* § 4(c) and § 8(e). Oster carefully reviewed the document and sent it to an attorney friend of hers. Pl. Ex. 9, Oster Depo at 119:25-120:7.

On May 14, 2015, Caithness sent Oster paperwork regarding her equity interest in both the Moxie Freedom Project and the WestGen investment project, including both a draft loan agreement and an interest transfer agreement. Def. Ex. 20 (Dkt. No. 54-22). These documents laid out the general terms of the investment agreement Caithness was offering to Oster. They provided that Oster could invest 1% of the capital Caithness Energy was investing in these projects in exchange for 1% of the return and Caithness Energy would loan Oster the 1% commitment in a non-recourse loan with a 10% interest rate. Pl. Ex. 16 (Dkt. No. 58-20); Def. Ex. 21 (Dkt. No. 55-9); Pl. Ex. 19 (Dkt. No. 58-18); Def. Ex. 23 (Dkt No. 55-10). They also stated that she would only receive payouts from distributions after interest on the loan had been paid and that the loan would be collateralized against Oster's interests in other Caithness Energy projects that she might have or later acquire.

### D. Oster Attempts to Negotiate

Oster had questions and concerns about the employment agreement and the investment documents and did not sign them. Def. Ex. 10, Request for Admission ("RFA") 31 (Dkt. No. 54-12); Pl. Ex. 9, Oster Depo at 122:8-14. Instead, she approached one of Caithness's Senior Vice Presidents, Mr. Casale, to discuss and attempt to negotiate some of the terms of the agreements. Def. Ex. 10, RFA 32-34; Pl. Ex. 9, Oster Depo at 115:17-118:9, 122:8-12. Oster was particularly concerned that the 10% interest rate in the loan agreement was too high and discussed this issue with Casale. Oster Decl. ¶ 9; Pl. Ex. 9, Oster Depo at 124:23-125:22. She mentioned that she might take out an equity line on her house in lieu of accepting the 10% interest rate in the loan agreement. Pl. Ex. 5, Casale Depo at 26:5-15 (Dkt. No. 57-7); Oster Decl. ¶ 6.

Casale told Oster that she did not need to accept the loan to invest in the Caithness projects, but that if she took a loan, the 10% interest rate was non-negotiable. Pl. Ex. 9, Oster Depo at 118:25-119:5. He explained that the terms of the investment "were not open to negotiation" because they were part of the terms of a separate agreement among Caithness's three controlling families. Def. Ex. 4, Bishop Depo at 48:1-24 (Dkt. No. 54-6). He told her that she should speak to Gelber if she had concerns with the terms. Pl. Ex. 9, Oster Depo at 117:2-14; Pl. Ex. 5, Casale Depo at 32:5-33:14.

On June 24 and 25, Oster met with Gelber to discuss the terms of her potential investment in the Moxie project. Pl. Ex. 9, Oster Depo at 115:5-116:7, 117:7-16, 122:17-124:3. Oster had still not signed the Loan Agreement or Interest Transfer Agreement because she wanted to see if there "was any potential to up-front" her 1% interest." *Id.* at 122:10-14. Oster raised her concerns with the 10% interest rate with Gelber; queried whether she could be paid up front on part of the investment, instead of over the life of the project; and asked if she could get a $1.5 million special bonus and a comparable year-end bonus. Def. Ex. 6, Gelber Depo at 69:15-70:11, 71:12-22; Pl. Ex. 9, Oster Depo at 115:17-118:9. During these conversations, she presented Gelber with various projections of how she believed the Moxie project would pay out to demonstrate that she would not see a return on her investment for a number of years. Pl. Ex. 9, Oster Depo at 125:8-22, 143:2-6. Gelber rejected Oster's requests to modify the agreements. *Id.* at 123:14-124:3.

On June 26, Oster spoke with Casale about finalizing her paperwork to memorialize her 1% equity interest in the Moxie Freedom Project. *Id.* at 141:20-25. Casale told Oster that Gelber had told him to put her paperwork "on hold" and make it his "lowest priority." *Id.* at 122:1-7. He told her "Les [Gelber] says don't finalize them. We can't finalize them." *Id.* at 122:10-14.

Concluding that Gelber was upset with her, Oster called him to apologize. *Id.* at 141:20-25. Gelber told her she was a difficult partner and questioned her math skills, noting that he thought her projections for how long it would take her to see returns on the Moxie investment seemed inaccurate. *Id.* at 141:16-144:19. Gelber felt that the models she had used to project the Moxie project's returns misrepresented and devalued the project. *Id.* at 142:10-23. He told her that if she was at a public company she would have been fired for misrepresenting what the project

was worth.  *Id.* at 142:2-4.  Oster declares that Gelber was clearly agitated but never told her that her "right to have a 1% equity investment in the Moxie Freedom Project had been rescinded." Oster Decl. ¶ 8.  Gelber remembers the conversation differently, claiming that he told Oster twice that her equity interest was off the table.  Pl. Ex. 3, Gelber Depo at 152:10-21, 209:7-20.  If he did affirmatively rescind Oster's offer to invest in the Moxie project, he did not memorialize that rescission in any document.

On June 29, 2015, Oster spoke with McNamara, another Vice-president at Caithness, who advised her not to approach Gelber about her equity interest.  Pl. Ex. 9, Oster Depo at 146:1-12. When Oster asked him if Gelber would "make good on his promise" regarding her equity interest McNamara said "[Y]es, just keep your head down, and [] do your work."  *Id.*

Over the next few months, Oster worked with Gelber to finalize and close the Moxie project for Caithness.  The topic of Oster's potential equity interest in the project was largely ignored.  At some point in August, 2015, Gelber told Oster, in the course of a discussion about how to approach equity investors, that Moxie was her "investment as well."  Oster Decl. ¶ 13; Pl. Ex. 9, Oster Depo at 109:5-18.  In early November, days before the Moxie project closed, Gelber brought up the agreement again, telling Oster, "[W]e got to sign our agreement [] and I'm going to get that to you."  Pl. Ex. 9, Oster Depo at 153:16-24.  He told Oster that "it was a better deal for [her]" and that she was "going to be happy with the agreement."  *Id.* at 161:19-162:17.  Caithness closed the Moxie Freedom Project deal on November 10, 2015.  Def. Ex. 8, Heath Depo at 41:6-9 (Dkt. No. 54-10).

Following the close of the Moxie project, Gelber asked Casale to work with legal counsel for Caithness to prepare a "special bonus payment" for Oster in lieu of her 1% equity interest.  Pl. Ex. 3, Gelber Depo at 113:3-116:25.  Casale told Oster that they were going to be sending her a letter agreement that would "have the one percent, but it was going to be paid out differently."  Pl. Ex. 9, Oster Depo at 162:11-17.  On December 2, 2015, Caithness sent Oster an alternative letter agreement through which Oster would not invest in the project, but during her employment with Caithness would have "the right to receive . . . in cash an amount equal to 1% of amounts that [Caithness Energy] has chosen, in its discretion, to distribute to Moxie Members."  Def. Ex. 27

(Dkt. No. 54-28).  This income distribution would become wholly discretionary if Oster left Caithness, an arrangement that Caithness says was necessary to prevent Oster from being subject to significant tax penalties.  *Id.*; Def. Ex. 5, Casale Depo at 64:16-22 (Dkt. No. 54-7).  On December 3, 2015, Oster rejected this offer and asserted that she was entitled to an investment opportunity.  Def. Ex. 28 (Dkt. No. 54-29).

On December 8, 2015, she sent an email reiterating her position that she was entitled to an investment opportunity and asserting that she had been treated "differently from my colleagues."  Def. Ex. 30 (Dkt. No. 54-31).  She stated that she was promised a "right to invest in and receive a 1% stake in Moxie" that was "never dependent on my continued employment at Caithness and [] was never discretionary."  *Id.*

Following Oster's rejection of the alternative letter offer, Gelber determined that "it would be best to separate Kim Oster from Caithness."  Def. Ex. 6, Gelber Depo at 107:15-108:4.  He and Barbara Bishop Gollan decided to terminate Oster and on January 15, 2016, Gollan sent Oster a termination letter.  Def. Ex. 32 (Dkt. No. 54-33).  Oster responded to this letter on January 26, reiterating her belief that she had been promised an equity interest in the Moxie Freedom Project.  Def. Ex. 33 (Dkt. No. 54-34).  Gollan replied on February 9, explaining Caithness's position that Oster had never acquired an interest in the Moxie project because, although she had been offered an equity stake on "the same terms offered to partners of the firm," she had rejected it.  Def. Ex. 34 (Dkt. No. 54-35).  This lawsuit followed.

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial."  *Id.*  The party opposing summary

judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

There are seven live claims remaining in this case, but they can be sorted into four groups. The first group contains Count 1: Breach of an oral contract; Count 8: Breach of an implied contract; and Count 9: Breach of the implied covenant of good faith and fair dealing, (collectively the "Contract Claims"). These claims overlap because they all depend on the existence of a valid contract, which defendants claim never existed. The second group contains Count 11: False Promise; and Count 12: Intentional Misrepresentation, (collectively the "Fraud Claims"). The parties agree that these claims rise and fall together as for both Oster must show that she justifiably relied on a misrepresentation, which defendants claim was never made. The third group contains Count 2: Promissory Estoppel. This claims overlaps in certain ways with both the Contract Claims and the Fraud Claims. To succeed on this claim Oster must demonstrate that she reasonably relied on a clear and unequivocal promise, of which defendants assert there is no evidence. The fourth group contains only Count 5: Retaliation in violation of the Fair Employment Housing Act ("FEHA"), (the "Retaliation Claim"). For this claim, Oster must show that she engaged in some protected activity under FEHA and faced some adverse employment action as a result, which defendants contend Oster has not shown. As discussed below, I agree that Oster has failed to create a material issue of fact regarding these necessary elements. As a result, summary judgment in favor of Caithness is appropriate.

## I.     THE CONTRACT CLAIMS

Oster's claims for breach of an oral contract, breach of an implied contract and breach of

the implied covenant of good faith and fair dealing all require the existence of a valid contract. Under California law, a breach of contract claim has four elements: (1) that there is a contract between the parties; (2) that the plaintiff performed her contractual obligations or was excused from performance; (3) that the defendant breached its contractual duties; and (4) the plaintiff was damaged. *See Reichert v. General Ins. Co.*, 68 Cal. 2d 822, 830 (1968). The elements of a claim for breach of implied covenant of good faith and fair dealing are similar and also require the existence of a contract. These elements are: "(1) the plaintiff and the defendant entered into a contract; (2) the plaintiff did all or substantially all of the things that the contract required him to do or that he was excused from having to do; (3) all conditions required for the defendant's performance had occurred; (4) the defendant unfairly interfered with the plaintiff's right to receive the benefits of the contract; and (5) the defendant's conduct harmed the plaintiff." *Munson v. Splice Commc'ns, Inc.*, No. 12-cv-05089-JCS, 2013 WL 6659454, at *21 (N.D. Cal. Dec. 16, 2013. An implied contract is a contract where "the existence and terms [of the contract] are manifested by conduct." Cal. Civil Code § 1621. "An implied contract consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words." *Stanley v. U. of S. California*, 178 F.3d 1069, 1078 (9th Cir. 1999) (internal quotation marks omitted). And, "All contracts may be oral, except such as are specially required by statute to be in writing." Cal. Civil Code § 1621.

Caithness asserts that summary judgment is appropriate on all three of Oster's Contract Claims because the evidence demonstrates that no contract was formed. It argues that, while various individuals told Oster that she would have an opportunity to obtain a 1% equity interest in the Moxie project, the terms of this potential investment were too vague to constitute an enforceable agreement. Motion for Summary Judgment ("Mot.") at 12 (Dkt. No. 54). In opposition, Oster asserts that the terms of the contract were sufficiently definite to give rise to a valid contract and that a contract should be enforced even if "the court is required to fill in some gaps." Opposition to Motion for Summary Judgment ("Oppo.") at 11 (Dkt. No. 57).

"In order for acceptance of a proposal to result in the formation of a contract, the proposal must be sufficiently definite, or must call for such definite terms in the acceptance, that the

performance promised is reasonably certain." *Heredia v. Intuitive Surgical, Inc.*, 2015 WL 7720915-EJD (N.D. Cal. Nov. 30, 2015). "Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable." *Netbulla, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007). Although a court may "fill in some gaps" in a contract, the contract must be "sufficiently definite . . . for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached." *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 623 (1991).

Oster cobbles together a combination of statements from Gelber, documents mentioning her alleged interest in the Moxie Freedom Project, and her work for Caithness to contend that there is at least a material dispute over whether a contract was formed. But this evidence is a house of cards that topples on examination.

## A. The Parties Never Reached an Agreement

Oster asserts that on three separate occasions, Gelber told her that "she had a right to invest in 1% of the Moxie Freedom Project in exchange for 1% of the net profits" and that Oster accepted these terms each time they were promised.[2] Oppo. at 11-12. This assertion is not borne out by the record before me.

In early 2015, Gelber told Oster and Moxie CFO Scott Taylor, that Oster "would receive a one percent equity interest in Moxie." Pl. Ex. 9, Oster Depo at 109:5-18. Oster declares that she "acknowledged" this statement and "made no objection." Oster Decl. ¶ 13. Gelber did not outline how Oster would receive such an interest, what the terms of the investment would be, or what Oster's obligations would be.

Oster was not presented with the specific terms of her potential investment until May, 2015, when Caithness sent her a proposed transfer agreement and loan agreement proposing, generally, that Oster could invest 1% of the capital in the Moxie project in exchange for a 1%

---

[2] Oster does not argue, nor could she, that Gelber promised 1% of the net profits simply as a result of bringing the project to Caithness. Even in Oster's telling, she understood there were terms of this investment, the same ones offered to other Caithness employees, to which she would have to agree.

equity interest, and that Caithness would provide Oster with a non-recourse loan to cover her portion of the investment at a 10% interest rate. *See* Pl. Ex. 15; Pl. Ex. 18; Pl. Ex. 19. Oster did not sign these agreements because she wanted to see if there "was any potential to up-front" her 1% interest. Pl. Ex. 9, Oster Depo at 122:10-14. She then attempted to negotiate a number of terms of the proposed agreements and tried to see if she could get the up-front payout on the 1% interest, a $1.5 million bonus, and a lower interest rate on the proposed loan. *See* Def. Ex. 6, Gelber Depo at 69:15-70:11, 71:12-22; Pl Ex. 9, Oster Depo at 115:17-118:9; Def. Ex. 26. Gelber rejected Oster's proposals to modify the terms. Pl Ex. 9, Oster Depo at 123:14-124:3. When Oster later talked to Casale about finalizing the agreements, she was told "Les [Gelber] says don't finalize them. We can't finalize them." Pl Ex. 9, Oster Depo at 122:10-14.

At some point in August, 2015, Gelber told Oster, in the course of a discussion about how to approach equity investors, that Moxie was her "investment as well." Oster Decl. ¶ 13; Pl. Ex. 9, Oster Depo at 109:10-15. Oster acknowledged and did not object to this statement. Oster Decl. ¶ 13. Oster and Gelber did not discuss the terms of the investment.

In early November, days before the Moxie project closed, Gelber brought up the topic of Oster investing in Moxie. He told her "we got to sign our agreement [] and I'm going to get that to you." Pl. Ex. 9, Oster Depo at 153:16-24. Gelber did not tell Oster what the terms of the agreement would be, but told her that "it was a better deal for [her]" and that she was "going to be happy with the agreement." Pl Ex. 9, Oster Depo at 161:19-162:17. Oster acknowledged and did not object to these statements. Oster Decl. ¶ 13.

None of this evidence demonstrates that the parties reached an oral or implied agreement. Gelber's statement to Oster in early 2015 that she "would receive a one percent equity interest in Moxie" did not include necessary material terms, such as what Oster's obligations or duties would be to receive such an interest. Oster could not accept this proposal because she was not aware of what the terms of the agreement would be. When Oster was eventually presented with the proposed terms, she was dissatisfied with them and attempted to negotiate different ones. As Oster was not aware of the terms of the investment opportunity in early 2015, the parties could not have reached an oral agreement at that time.

Even if the terms were sufficiently definite, Oster's indication that she acknowledged and did not object to Gelber's statement is insufficient to demonstrate acceptance – an acceptance must be "unequivocal and the terms accepted must be identical to those offered." *Dragicevich v. Chase Home Fin. LLC*, 2013 WL 3982950, at *3 (C.D. Cal. July 8, 2013); *Ajax Holding Co. v. Heinsbergen*, 64 Cal. App. 2d 665, 679 (1944) ("To be effective an acceptance must be unequivocal and positive and must comply with the terms of the offer."). Oster's mere acknowledgement of Gelber's statement and failure to object to it is not an unqualified and positive acceptance. *See Worldwide Subsidy Grp., LLC v. FIFA*, 2014 WL 12631652, at*18 (C.D. Cal. Jun. 9, 2014) (FIFA's statement that it was "interested in" the plaintiffs' services was not an absolute and unequivocal acceptance). The parties did not reach an agreement in early 2015.

Nor did they reach an agreement in August. Gelber's statement in August that Moxie was Oster's "investment as well" is too vague to give rise to an enforceable agreement as it does not include any terms at all. Gelber's comment is only a general statement, not a specific and enforceable offer. Further, Oster failed to accept this purported offer in positive and unequivocal terms as she again declares that she merely "acknowledged" and "did not object" to it. Without any material terms, Gelber's general comment could not give rise to an enforceable agreement. And Oster's mere acknowledgement was not sufficient to manifest an acceptance. The parties did not reach an agreement in August, 2015.

Finally, the parties did not reach an agreement in November. Gelber's statements that he would be sending Oster her agreement and that "it was a better deal for [her]" indicates that he was planning to send her a new agreement with different terms than the ones she had previously seen and rejected. Oster declares that she "acknowledged" and "did not object" to this statement, but this exchange could not have resulted in an enforceable agreement as Oster did not know what the terms of the new agreement would be. Further, her acknowledgement was insufficient to constitute an acceptance.

Oster's account of her negotiations and discussions with Gelber regarding her potential investment in Moxie demonstrates that the parties did not reach an agreement. The terms of the agreement were not sufficiently clear and definite on any of the three occasions to form the basis

of an enforceable contract, and Oster did not unequivocally and positively accept any of Gelber's purported offers.

Oster attempts to argue that the terms of the agreement were always clear and definite because Caithness used the same investment terms for all employees and these terms were non-negotiable. However, she has not presented any evidence that *she* knew what Caithness's typical terms were prior to receiving the draft agreements in May, 2015. In her deposition, Oster testified that, before she was hired, she was told that she would have an opportunity to invest in projects she worked on "on the same terms and conditions as other employees." Def. Ex. 1, Oster Depo at 79:6-17. She reports that at this time she was also told that she could obtain an ownership interest in the projects and would be given a non-recourse loan to cover her investments. *Id.* at 79:17-22. She does not recall ever being told what the interest rate of such a loan would be. *Id.* at 79:17-19. While Oster was made aware of very general aspects of these investment opportunities before she was hired – employees could obtain ownership interests with the assistance of non-recourse loans– she was not told any essential terms of these investment agreements or loans.

In December, 2013, Oster was told that she would have an opportunity to obtain an ownership interest in the WestGen project. *Id.* at 79:20-25. She was not told the terms of the investment and was not presented with a formal agreement. *Id.* Instead, she was told that "the paperwork [for the investment] was not going to be done right away" but "would be done if we won the bid." *Id.* at 76:7-16. She understood that the specific terms of the investment "would have been in the paperwork." Oster did not receive any paperwork for the WestGen investment until May, 2015, when she received the proposed terms of both the WestGen and Moxie investments. Prior to May, 2015, Oster understood that her potential investment would be "on the same terms and conditions as other employees" but she did not know what those terms were and so could not validly accept and agree to be bound by them. And, as discussed before and below, she never indicated that she agreed to those terms once they were presented to her.

Oster also argues that the terms of the proposed contract were sufficiently clear because "Ms. Oster knew that the terms of her 1% interest in the Moxie project would be the same as for her 1% interest in the WestGen project." Oppo. at 14. This argument also fails because, as just

discussed, the evidence shows that Oster did not learn what the terms of the WestGen project were until May, 2015, when she received the draft agreements and the terms for both investments. Knowing that the projects would be on the same terms does not advance the ball if she did not know the terms of either project.

Oster has failed to demonstrate that the parties reached an agreement with sufficiently definite terms to constitute a valid contract.

### B. Oster's argument that she accepted Caithness's formal offer through performance fails

Oster attempts to argue that she did not reject the formal, written offer Caithness provided in May, 2015, and in fact accepted this offer through performance. She acknowledges that she attempted to negotiate different terms of the proposed agreements with Gelber, but argues that this negotiation should not be considered a counter-offer, and therefore a rejection[3] of Caithness's offer, but rather an attempt to negotiate the terms of an ancillary agreement. Oster argues that her attempts to negotiate must be construed as part of an ancillary agreement because the terms of Caithness's offer were, according to Caithness "non-negotiable." She makes this argument even though the record is clear that she did not know the terms of the proposed agreements were "non-negotiable" from Caithness's perspective until *after* she attempted to negotiate them.

This is not a persuasive argument. Oster seems to suggest that because Caithness took a hard line position on the terms of these agreements it was metaphysically impossible for her to even attempt to negotiate those terms. Clearly this is not the case: the fact that Caithness considered the terms of its offers "non-negotiable" did not render them impervious to negotiation efforts. Oster still could have *attempted* to negotiate them, and as the record shows, she did.

Oster argues that she accepted Caithness's formal offer through "full performance, by bringing the Moxie Freedom Project to a successful close." While an offer to enter into a unilateral contract is accepted "by rendering a performance rather than providing a promise," *see Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 785 (9th Cir. 2012), Oster has failed to

---

[3] *See Born v. Koop*, 200 Cal. App. 2d 519, 524-25 (Ct. App. 1962) ("Under California law, a counter-offer is a rejection of a previous offer.")

identify any such offer. The formal contract Caithness offered to Oster outlines obligations of both Caithness and Oster and is a bilateral contract, not a unilateral contract. *See Sully-Miller Contracting Co. v. Gledson/Cashman Constr., Inc.*, 103 Cal. App. 4th 30, (2002) ("A bilateral contract consists of mutual promises made in exchange for each other by each of the two contracting parties."). Further, the offer does not call for Oster to accept the contract by bringing the Moxie Freedom Project to a close or even indicate that Oster is obligated to do so. Instead, Oster's primary obligation under the proposed Interest Transfer Agreement is to contribute the capital investment for her 1% ownership interest, something she never did. Oster could not and did not accept Caithness's formal offer by bringing the Moxie Freedom Project to a close.

### C.  Oster's documentary evidence of an agreement does not help

Oster argues that, even though it is unclear when the parties reached an agreement, various documents indicate that the parties did reach an agreement at some point. None of this evidence is sufficient to create a material issue of fact as to the formation of a contract.

Oster first points to the emails she sent to Caithness in December 2015 in which she stated that Caithness's non-equity proposal "does not reflect our prior agreement" that she "would have the right to invest and receive a 1% ownership in Moxie when the deal closed." Pl. Ex. 24; Pl. Ex. 25. Oster asserts that these contemporaneous statements indicate that an agreement was reached. While she may have believed in December, 2015 that the parties had previously reached a valid agreement, her subjective belief is not supported by her own account of the actual negotiations that took place. Her statements in December, 2015 characterizing the parties' negotiations do not demonstrate that an agreement was reached.

Oster next points to the proposed Interest Transfer Agreement and Loan Agreement that Caithness sent to Oster in May, 2015, which Oster did not accept or sign. She notes that the proposed Interest Transfer Agreement states that her LLC "has been issued" a 1% interest in the Moxie project and argues that this demonstrates that she acquired a 1% interest. Pl. Ex. 19 at 1. This selective quote is highly misleading. A more extended version of the same language is "pursuant to this Agreement, and in connection with Ms. Oster's continuation of employment with Caithness, Tokeneke has been issued" a 1% interest. *Id.* As this language demonstrates,

15

Tokeneke is to receive a 1% interest "pursuant to" the Interest Transfer Agreement. Because Oster did not sign or agree to this document, the interest transfer it discusses never happened.

The proposed Loan Agreement is similarly unpersuasive. Although this document states in various parts that Oster's LLC holds a 1% interest in the Moxie project, it also makes clear these interests are "pursuant to that certain Interest Transfer Agreement" that Oster never signed and which never became effective. Pl. Ex. 15 at 2. The proposed Interest Transfer Agreement and the proposed Loan Agreement do not demonstrate that Oster held a 1% equity interest in the Moxie project: rather, they demonstrate that Caithness offered her an agreement that would have provided her with a 1% equity interest, but that she did not accept the offer.

Finally, Oster points to an August, 2015 email in which Sharon Q. Li, a bookkeeper for the Bishop family (one of the families that controls Caithness), lists Oster as holding a 1% equity interest in the Moxie project. Pl. Ex. 20. Oster argues that this email demonstrates that, as late as August, 2015, Caithness believed Oster held an interest in Moxie. This email does not demonstrate that Oster actually acquired an equity interest in Moxie. First, as defendants note, Li is not a Caithness employee and cannot speak on behalf of the company. Second, Li's email indicates that the list of investors she put together was "per Feb' Master Distribution File." *Id.* Oster does not present any evidence that she and Caithness had an oral contract regarding her investment in Moxie as early as February, 2015. The February list Li pulled from may have reflected Caithness's expectations as to who would invest. Regardless, as the detailed discussion above regarding the parties' actual negotiations demonstrates, although Oster was subsequently offered the opportunity to acquire a 1% interest in Moxie she did not unequivocally accept it and no contract was ever formed.

### D. The Seventh LLC Agreement of Caithness Energy

At oral argument, counsel for Oster submitted that the Seventh Amended and Restated Limited Liability Company Agreement for Caithness Energy, LLC ("Seventh LLC Agreement") was a key document in this case. Counsel admitted that the importance of this document was not particularly well-highlighted in Oster's opposition. Indeed, Oster cited to it only twice, and only as a supplemental source for the identities the Board of Directors of Caithness Energy LLC

("Caithness Energy") and to support the claim that Oster incorporated Tokeneke, LLC and owned it in full. At oral argument, however, counsel asserted that this document is important in two respects: (1) it helps demonstrate that Gelber did not rescind the offer of her 1% interest in the Moxie Freedom Project; and (2) because Oster signed it, she agreed to be bound by the Interest Transfer Agreement. The Seventh LLC Agreement supports neither of these assertions.

Oster points to the document as support for her argument that Gelber did not actually rescind her 1% equity offer, arguing that, if he had rescinded it, surely he would have informed Caithness's attorneys, and they would not have asked Oster to sign the Seventh LLC Agreement. This point is not particularly important, since Oster has failed to demonstrate that she accepted any offer, rescinded or not, and because Oster's attempts to negotiate the offer are likely a counter-offer and a rejection. Nevertheless, this argument fails because, as the emails attached to the Seventh LLC Agreement show, Caithness's attorneys asked Oster to sign this document on June 4, 2015, *see* Pl. Ex. 4 at 91 (Dkt. No. 58-27), weeks *before* Oster attempted to negotiate the terms of the Interest Transfer Agreement and Loan Agreement and before Gelber purportedly rescinded the 1% equity offer. That Caithness's attorneys asked Oster to sign the Seventh LLC Agreement before Gelber purportedly rescinded Oster's 1% equity interest offer does not undermine Gelber's claim that he rescinded the offer.

In addition, that Oster signed the Seventh LLC Agreement does not indicate that she agreed to be bound by the terms of the proposed Interest Transfer Agreement. The Seventh LLC Agreement, which Oster signed on June 4, 2015, indicates that Oster's company, Tokeneke LLC, has become a "member" of Caithness Energy. Pl. Ex. 4 at 7. The Seventh LLC Agreement appears to be in partial draft form. For example, it lays out the rights and obligations of members and notes that members have made capital contributions to the company in line with their "Investment Percentages" and "Opportunity Percentages," as listed on Schedule B-2 and B-1. *Id.* at 23. However, Schedule B-1 and B-2 are blank in this draft of the document and no Opportunity Percentages or Investment Percentages are listed. *Id.* at 60-61.

Counsel did not make clear at oral argument which part of this incomplete document he believed indicated that Oster had agreed to be bound by the terms of the Interest Transfer

Agreement. He could have been referring to Section 17.9. Section 17.9 is titled "Integration" and states that "This Agreement and the Interest Transfer Agreements, and the Exhibits and Schedules thereto, constitute the entire agreement among the parties . . . ." *Id.* at 56. As this language demonstrates, the document seems to anticipate that the members have entered into, or will enter into, separate Interest Transfer Agreements and attempts to incorporate those Agreements. The document's language does not indicate that signing the Seventh LLC Agreement will somehow bind the signatory to the referenced Interest Transfer Agreements as well. Nor could it, since the document does not make clear what the terms of the separate Interest Transfer Agreements are and, as discussed above, an agreement must be sufficiently definite and clear in its terms to give rise to a valid legal obligation. Oster could not and did not bind herself to the terms of the Interest Transfer Agreement by signing the Seventh LLC Agreement.

Oster has failed to present sufficient evidence to create a material issue of fact regarding whether she and Caithness ever reached an agreement. The record shows that there was no meeting of the minds. Oster never accepted an offer with sufficiently definite terms to form an enforceable contract. Without an agreement, there can be no breach of contract and no breach of the implied covenant of good faith and fair dealing. Accordingly, summary judgment on Oster's Contract Claims is appropriate.

## II.     FRAUD AND MISREPRESENTATION CLAIMS

Oster brings claims for false promise and intentional misrepresentation. These claims have nearly identical elements. "Under California law, a cause of action for fraud based on a false promise must allege: (1) a material misrepresentation, (2) knowledge of its falsity, (3) intent to defraud or induce reliance, (4) justifiable reliance, and (5) resulting damage." *First Advantage Background Servs. Corp. v. Priv. Eyes, Inc.*, 569 F. Supp. 2d 929, 938-39 (N.D. Cal. 2008). And a claim for intentional misrepresentation must allege: "(1) a misrepresentation; (2) knowledge of falsity; (3) intent to induce reliance; (4) actual and justifiable reliance; and (5) resulting damage." The parties agree that the elements of these claims are sufficiently similar that the claims rise and fall together. Oppo. at 22; Reply in Support of Motion for Summary Judgment ("Reply") at 13 (Dkt. No. 61-4).

Caithness argues that summary judgment is appropriate on these claims because (1) there was no misrepresentation; and (2) even if there was, Oster has not identified how she justifiably relied on any misrepresentation or suffered any damage. I agree.

Oster claims that Gelber made several intentionally false promises or misrepresentations to her. Oppo. at 22. She asserts that Gelber promised that "she would have the right to become an equity partner" to induce Oster to accept employment at Caithness and that Gelber then repeatedly promised her that she could invest in the Moxie project to induce Oster to continue working on the Moxie project instead of leaving Caithness and taking the Moxie project with her. *Id.* That is not what the record shows.

The evidence demonstrates that Gelber did not make Oster a false promise, or misrepresent any facts, to induce her to accept employment at Caithness; to the extent he made her any promise prior to her accepting the employment offer, it was genuine and not knowingly false. Oster's and Gelber's deposition testimony establish that, before accepting Caithness's offer of employment, Oster indicated that she was interested in becoming a partner at Caithness. Def. Ex. 1, Oster Depo at 27:4-11; Pl. Ex. 3, Gelber Depo at 34:2-35:5, 41:3-13. But she concedes that Gelber told her that it was not possible for her to become a partner immediately and that he would have to get to know her better before that was an option. Def. Ex. 1, Oster Depo at 28:1-2; Pl. Ex. 3, Gelber Depo at 34:2-11.

She also testified that Gelber told her she would have a "right to an equity interest in projects that [she] led" similar to investment arrangements of other Caithness employees. Def. Ex. 1, Oster Depo at 28:12-29:7; Pl. Ex. 1, Bishop Depo at 36:13-37:17. In June, 2015, true to this statement, Caithness sent Oster draft investment agreements offering her the chance to invest in the WestGen and Moxie projects on the same terms offered to other Caithness employees. Def. Ex. 20; Def. Ex. 22. In response, Oster thanked Gelber "for making good on his promise." Def. Ex. 1, Oster Depo at 122:17-20. To the extent that Gelber promised Oster the right to invest in projects she led, on the same terms as other Caithness employees, he delivered on that promise.

There is no evidence that Gelber's representations to Oster during her employment negotiations were intentional misrepresentations. Instead, the record indicates that Gelber's

19

representations were genuine and that he intended to, and did, follow through. His later dispute and falling out with Oster over the terms of the investment do not render his earlier statements retroactively false. Oster has failed to present evidence to create a material fact on the issue of whether Gelber made a misrepresentation to her to induce her to accept employment with Caithness.

Oster argues that Gelber later renewed his promise that Oster could invest in Moxie in both August and November 2015. It is plausible that Gelber's statement in August that Moxie was "Oster's investment as well" was a misrepresentation, as Gelber never renewed the original offer to allow Oster to invest in the project. Since Caithness's own evidence indicates that Gelber and Caithness did not intend for Oster to become an equity investor in the project by August, 2015, this statement could be a material or intentional misrepresentation. Gelber's statement in November is less clear. Gelber did not tell Oster that she was an investor or could be an investor, and only vaguely indicated that he would be sending her an agreement that would be "better" for her.

Assuming for the sake of argument that Gelber's statements in August and November were misrepresentations, Oster's claims nevertheless fail because she has not presented evidence of justified reliance and injury on her part as a result of these statements. Oster identifies a number of ways in which she relied on Gelber's promises, but many of these occurred before she accepted a job at Caithness. The only ones that could plausibly apply to Gelber's statements in August and November, 2015, are that she "worked diligently to successfully close" the Moxie deal and on "everything that the company wanted [her] to do," and that she forewent "taking the [Moxie] project to other companies." Def. Ex. 11 (Complaint) ¶ 59.

As defendants point out, Oster's decision to work diligently on her projects at Caithness is not a legally cognizable injury; Oster was already obligated to do this as part of her job. Defendants note that Oster has admitted that she had a fiduciary duty to Caithness, *see* Def. Ex. 10, RFA 81, and that working on the Moxie deal and on other projects at Caithness was within the scope of her employment duties, *see* Def. Ex. 1, Oster Depo at 197:22-198:2. She was not injured by diligently completing her work because she had an independent obligation to do that work and

was compensated for it with her normal salary and benefits.  *See Gurvey v. Legen Films, Inc.*, 2012 WL 4061773, at *12 (S.D. Cal. Sept. 14, 2012) (plaintiff could not show injury by reliance where she was compensated for the services she performed); *see also US Ecology, Inc. v. State of California*, 111 Cal. Rptr. 2d 689, 701 (2001) ("A promise to perform a preexisting legal duty is not supported by consideration.").

Oster's second theory of injury by reliance also fails.  She asserts that she was injured because, in reliance on Gelber's promises, she did not take the Moxie project to other companies. But she has presented no evidence that she actually could have taken the Moxie project to any other company.  First, Oster admits that, under the terms of her employment, she "could not have brought the Moxie Freedom Project to another Person while employed at the Caithness Defendants."  Def. Ex. 16.  Oster emphasizes that her employment was "at-will" and contends that she could have left Caithness as any time, at which point she would not have been bound by the terms of her employment agreement.  She suggests that she "could have decided to leave Caithness once negotiations were underway, leading to an unraveling of the deal or a reasonable decision by Mr. Taylor to terminate discussions with Caithness and follow Ms. Oster to her next place of employment."[4]  While it is clear that Oster could have left Caithness at any time, she has not presented any evidence that she actually had other employment opportunities or that, if she left, Taylor and the Moxie project would have followed her.  Her claim that she could have left Caithness and taken the Moxie project with her appears to be speculative.  Without any evidence that Oster had an actual opportunity to take the Moxie project to another employer, there is no evidence of reliance or injury.

The evidence demonstrates that all of Gelber's statements, promises, or representations to Oster prior to May, 2015, were truthful.  These statements cannot form the basis of a false promise or misrepresentation claim.

---

[4] Oster also argues that "there was no reason that Ms. Oster could not have left Caithness and taken the project with her at the outset."  Oppo. at 22.  However, this reliance theory does not line up with any misrepresentation.  The evidence shows that at the outset of the Moxie project, Gelber was truthfully telling her that she would have an opportunity to become an investor on the project, as he later provided her with a formal offer to invest.

The evidence further demonstrates that Oster was not injured as a result of any reliance on Gelber's statements made in August and November, 2015.  Her decision to work diligently is not an injury because she was already obligated to do so.  Her claim that she was injured because she did not leave Caithness and take the Moxie project with her also fails because she has not presented any evidence that she had a real opportunity to do so.  Without any evidence that Oster was injured through reliance, she cannot sustain her false promise or misrepresentation claims based on Gelber's statements in August or November.

Summary judgment is appropriate on Oster's false promise and misrepresentation claims.

## III.     PROMISSORY ESTOPPEL

"The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *Jones v. Wachovia Bank*, 179 Cal. Rptr. 3d 21, 28 (2014).  Caithness argues that summary judgment is appropriate on Oster's promissory estoppel claim because she cannot show that Caithness made her a promise in clear and unambiguous terms or that she reasonably relied on any such promise.  Because I conclude that Oster has not shown that she reasonably relied on any promise, summary judgment is appropriate on these claims.

### A.     Oster could not have reasonably relied on any promise made before she signed her employment agreement

As discussed above, before Oster signed her employment agreement Gelber told her that she could not become a partner immediately, but that she would have a "right to an equity interest in projects she led" on similar terms to those offered to other Caithness employees.  Def. Ex. 1, Oster Depo at 28:12-29:7; Pl. Ex. 1, Bishop Depo at 36:13-37:17.  He also reportedly told her that Caithness would offer her a non-recourse loan to cover the cost of her equity investment.  Def. Ex. 1, Oster Depo at 79:17-22.  Oster asserts that she relied on this promise, to her detriment, by accepting employment at Caithness in lieu of a bonus offered by her former employer.

Gelber's statements were not sufficiently "clear and unambiguous" to sustain a valid promissory estoppel claim because they were missing necessary and essential terms, such as what

United States District Court
Northern District of California

the terms of the investment and loan would be. *See White v. J.P. Morgan Chase, Inc.*, 167 F. Supp. 3d 1108, 1113 (E.D. Cal. 2016). In *White*, the court concluded that a promise from Chase that plaintiff would be able to make a loan modification did not give rise to a promissory estoppel claim because it was missing essential terms, such as "payment schedules for each loan, identification of the security, prepayment conditions, terms for interest calculations, loan disbursement procedures, and rights and remedies of the parties in case of default." *Id.* Here, Gelber's promise that Oster would have the opportunity to invest in projects she led at Caithness lacked necessary essential terms and was not sufficiently "clear and unambiguous" to sustain Oster's claim. *See Snider v. Roadway Packaging Sys.*, No. C-99-2728-CRB, 2000 WL 375234, at *7 (N.D. Cal. Apr. 11 2000) ("Plaintiff cannot state a claim of promissory estoppel if no 'clear promise' has been made.").

Further, Oster has failed to demonstrate that she reasonably relied on Gelber's promise. As the record shows, when Oster accepted employment with Caithness in October, 2012, she signed an employment agreement with an integration clause that read: "This letter sets forth the terms of employment with Caithness and supersedes any prior representations or agreements, whether written or oral." Def. Ex. 17. The employment agreement does not contain any statement reflecting Gelber's promise that Oster would have an opportunity to invest in projects at Caithness. *Id.* A plaintiff cannot reasonably rely on extra contractual promises when an unambiguous integration clause excludes such promises or representations from the parties' agreement. *See AMC Tech., LLC v. Cisco Sys., Inc.*, No. 11-cv-3403-PSG, 2012 WL 174949, at *6 (N.D. Cal. Jan. 20, 2010) ("Even if Cisco's promise was clear and all the other elements of a promissory estoppel claim met, the integration clause by its terms bars any extra-contractual promises regarding its subject matter.").

Oster has not shown that she reasonably relied on any promise made prior to accepting employment at Caithness.

**B. Oster has not demonstrated that she reasonably relied on any promise made after she accepted employment at Caithness**

Oster argues that Gelber renewed his promise that she could invest in projects at Caithness

multiple times after she signed her employment agreement and that she relied on these promises, to her detriment. As discussed with regards to Oster's false promise and misrepresentation claims, Oster has failed to demonstrate that she was injured by her reliance on any misrepresentation or promise during her employment at Caithness. *See* Part II. She was not injured by diligently completing her work at Caithness because she had an independent obligation to complete the work within the scope of her employment. *Id.* Further, she has not demonstrated that she was injured by choosing not to leave Caithness and take the Moxie project with her because she has not presented any evidence that she actually had such an opportunity. *Id.*

Oster has failed to demonstrate that she reasonably relied, to her detriment, on any promise made either before or after she commenced her employment at Caithness. Because she cannot establish that she reasonably relied on any clear and unambiguous promise regarding her purported right to invest in projects at Caithness, summary judgment is appropriate on her promissory estoppel claim.

## IV.  RETALIATION IN VIOLATION OF FEHA (CAL. GOV. CODE § 12940)

Oster brings a claim for retaliation under FEHA, arguing that she was fired from Caithness for complaining about gender discrimination. Because Oster cannot demonstrate that she ever complained about gender discrimination, or that anyone at Caithness would have understood her to be complaining about gender discrimination, her retaliation claim fails.

"A prima facie case for retaliation requires that the employee show that: "(1) he or she engaged in a protected activity, (2) the employer subjected the employee to an adverse employment action, and (3) a causal link between the protected activity and the employer's action." *Lytel v. Simpson*, No. 05-cv-1937-JF, 2006 WL 1233094, at *5 (N.D. Cal. May 8, 2006). Under FEHA, employers are prohibited from discriminating against an employee on the basis of a number of individual qualities such as race, creed, color, national origin, sex, gender, etc. Cal. Gov. Code § 12940. Section (h) of the law specifically prohibits employers from terminating or otherwise discriminating against any person that raises a complaint regarding potential FEHA violations. Cal. Gov. Code § 12940(h). An employee may therefore make out a prima facie case of retaliation under FEHA by providing evidence that she filed a complaint, or engaged in some

24

other protected activity, regarding a FEHA violation, suffered an adverse employment action, and that the adverse action was the result of filing the complaint.

Oster asserts that she engaged in protected activity when she sent the December 8, 2015 email to Gelber, and stated "I believe I am – and have been – treated differently from my colleagues." Pl. Ex. 25. Although this email does not clearly complain about or identify any gender discrimination, Oster seems to suggest that because many of her colleagues were male, Gelber would have understood that she was attempting to complain about suspected gender discrimination. Oster also notes that Gelber once made "disparaging remarks about her math skills" and that three other people fired in recent years at Caithness were women. Pl. Ex. 26, Duffy Depo at 79:12-81:15. It appears that Oster is pointing to this evidence of potential discrimination to suggest that, despite her ambiguous email, Gelber was aware that gender discrimination was a problem at Caithness and would have understood Oster's complaint that she was being treated "differently" as a complaint about this discrimination. Oster's evidence is not sufficient.

Oster's vague statement that she was "treated differently from [her] colleagues" is not a clear attempt to complain about gender discrimination. First, although many of Oster's colleagues were male, she had female colleagues as well. Further, from the context of the email it is clear that Oster believed she was being treated "differently" because she was not being offered the same investment agreement as other employees at Caithness. Nothing in the email suggests that she believed this was because of her gender.

Evidence produced in discovery shows that this absence was intentional; Oster removed unambiguous language about gender discrimination from the email she ultimately sent. On December 7, 2015, the day before sending her email, a friend of Oster's drafted an email for her with the apparent purpose of generating a suspect firing. *See* Def. Ex. 29 ("If she [complains about gender discrimination], and she is fired, the firing will be suspect."). He suggested the following language: "I believe I am – and have been – treated differently in my employment from my male colleagues." Oster removed the terms "my employment" and "male" before sending her email to Gelber – suggesting that she either did not believe the email was accurate, or did not want

to complain about gender discrimination.

Oster's evidence of ongoing discrimination at Caithness is also not persuasive. Her evidence that Gelber disparaged her math skills does not evidence gender discrimination. Although women are sometimes discriminatorily stereotyped as having poor mall skills, the dispute between Gelber and Oster regarding her use of math does not evidence this type of discrimination. Gelber and Oster had a heated debate about actual math calculations because they had used different models to project the potential investment returns on the Moxie project. Gelber became angry because the model Oster had selected, which was an older model, projected a smaller return to investors. He believed she was intentionally devaluing the Moxie project by using that model. His criticisms of her math skills were based on her actual math and were rooted in a substantive disagreement about how she was projecting returns on the Moxie project. There is no evidence that Gelber's frustrations or criticisms were based on Oster's gender.

Oster's additional evidence of discrimination, that three other women were fired from Caithness in the time she was working there, is also not persuasive. The three other women were administrative assistants who did not hold positions comparable to Oster's. Further, Oster has provided no evidence that these women were fired for any improper purpose. The only evidence in the record indicates that these women were fired for job performance issues. Oster has not presented any convincing evidence that there was ongoing gender discrimination at Caithness, let alone a problem so substantial that an ambiguous email from a female employee complaining about being treated "differently" because she was not being offered the same terms as her colleagues on a specific investment would be understood as a complaint about gender discrimination.

There is insufficient evidence to show that Oster complained about gender discrimination or engaged in any protected activity under FEHA. Further, even if I assume that Oster attempted to complain about gender discrimination, there is insufficient evidence to suggest that Gelber, or anyone else at Caithness, would have understood her December 8, 2015 email to be such a complaint. Oster has failed to make out a prima facie case of retaliation because she failed to show that she complained about gender discrimination or that anyone understood her to be

1   complaining about gender discrimination.  Without any protected activity, there can be no

2   retaliation.  Alternatively, without anyone at Caithness realizing that she was attempting to

3   complain about gender discrimination, her subsequent firing could not possibly be the result of

4   improper retaliation.

5   Oster asserts that, even if she cannot show that she was retaliated against for complaining

6   about gender discrimination, she can show that she was terminated in retaliation for complaining

7   about not getting paid all the compensation she was owed.  Oppo. at 24  Although California

8   employees are protected from retaliatory acts for complaining about a failure to pay wages, *see*

9   Cal. Lab. Code §§ 98.6, 1102.5(b); 29 U.S.C. § 215(a)(3), as Caithness points out, Oster did not

10  plead such a claim in her complaint – her retaliation claim is brought under FEHA only.  *See* Def.

11  Ex. 11, ¶¶ 73-79.  Oster cannot pursue a new retaliation claim now at summary judgment.

12  Because Oster has failed to make out a prima facie case of retaliation for reporting gender

13  discrimination, summary judgment is appropriate on this claim.

## CONCLUSION

15  As outlined above, Oster has failed to create a material issue of fact on several essential

16  elements of her remaining claims.  Defendants' Motion for Summary Judgment on all of Oster's

17  remaining claims is GRANTED and judgment will be entered accordingly.

18  **IT IS SO ORDERED.**

19  Dated: August 30, 2017

William H. Orrick
United States District Judge